UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------x
RICHARD R. PALKIMAS          :
                             :
          Plaintiff,         :
                             :
v.                           :   Civil No. 3:08cv01836 (AWT)
                             :
KATHY BELLA, ANDREW WHELAN,  :
ROBERT HALL, and             :
RICKI GOLDSTEIN,             :
                             :
     Defendants.             :
-----------------------------x
```

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Richard R. Palkimas brought this action pursuant to 42 U.S.C. § 1983 against Kathy Bella ("Bella"), Andrew Whelan ("Whelan"), Robert Hall ("Hall"), and Ricki Goldstein ("Goldstein"), claiming violation of his constitutional right to privacy, and also brings a claim for violation of his right to privacy under Connecticut common law. The court granted the defendants' motion to dismiss as to defendants Hall and Goldstein. The remaining defendants, Bella and Whelan, have filed a motion for summary judgment. For the reasons set forth below, the motion is being granted.

**I. FACTS**

"On April 30, 2005 . . . the [plaintiff] was arrested and charged with conspiracy to commit assault for allegedly punching his pregnant girlfriend in the face." State v. Palkimas, 116 Conn. App. 788, 790 (2009). The police report stated that "her

1

injuries consisted of a broken nose that will need plastic
surgery to reconstruct because it was 'flattened.'" (Def. Ex. H.)
The plaintiff's girlfriend was pregnant at the time of the
incident.  During the altercation the plaintiff's seven year old
daughter entered the room.

> As a result of this alleged incident, on May 2, 2005, the
> court issued a family violence protective order. . . .
> The protective order required, among other things, that
> the defendant refrain from entering the home where the
> victim resided and refrain from any threatening behavior.
> On June 4, 2005 . . . , the defendant was arrested and
> charged with violating the protective order on the basis
> of allegations that he was seen jumping from the window
> of the victim's residence.

Palkimas, 116 Conn. App. at 790-91.

On June 28, 2005, the plaintiff applied for entry into the
one-year Family Violence Education Program.  He was granted entry
into the program on July 26, 2005, at which time the court
indicated that the previously issued protective order would stay
in effect.  On July 13, 2005, after the plaintiff had applied for
the program but before his application was granted, the
Connecticut Superior Court entered an Order of Temporary Custody,
placing the plaintiff's three minor children under the
guardianship of the Department of Children and Families ("DCF")
for an indefinite period.  The court found "as to all three
children . . . that each is in immediate physical danger [from
their] surroundings and that continuation in their home is
contrary to their welfare."  (Def. Ex. T ¶ 10 (alterations in

2

original).)  Shortly thereafter, on September 7, 2005 the plaintiff pled guilty to neglect in juvenile court.  As a result, DCF placed the family under protective supervision for the maximum period of time allowable, one year.

"On November 4, 2005, the [plaintiff] was arrested and charged with threatening in the second degree and violating a criminal protective order on the basis of an allegation that he telephoned his girlfriend . . . and threatened to physically harm or even kill her."  Palkimas, 116 Conn. App. at 791-92.

Shortly after the November 4th incident, defendant Bella was approached by Assistant State's Attorney Ricki Goldstein, who was seeking input from DCF regarding the plaintiff's case.  As the DCF liason to the Stamford Superior Court for the domestic violence docket, Bella is often called upon to provide input on behalf of DCF in domestic violence cases.  She participates in weekly meetings with the Stamford/Norwalk Judicial District State's Attorneys Office ("State's Attorneys Office"), victim advocates from two private agencies, local law enforcement officers, adult probation officers, a representative from the Alternatives to Incarceration program, and a representative from the Family Violence Education Program.  At these meetings, Bella "make[s] recommendations with the safety of children in mind." (Def. Ex. B ¶ 6.)  She also "provide[s] information about the status of any DCF investigation or case, service plans DCF has

3

established with families, and programming that has been put in place with parents, such as anger management, substance abuse, and parenting classes." (Id.) "Input is sought from DCF at these meetings on cases involving charges for criminal conduct directed solely at an adult victim if that conduct has potential repercussions for children in the household or environment." (Id. at ¶ 8.)

Bella approached defendant Whelan and Ondrea Faillace, i.e. the supervisor and social worker then assigned to the Palkimas case, and instructed them to contact Assistant State's Attorney Goldstein regarding how DCF could best assist the State's Attorneys Office. Faillace prepared an eight page letter detailing DCF's interactions with the Palkimas family, including incidents occurring before April 30, 2005 and continuing through November 10, 2005. DCF recommended that, due to the seriousness of the domestic violence, Palkimas receive the most serious consequence possible to ensure that his children and their mother, as well as members in the community at large, would be safe. After drafting the letter, which was dated December 2, 2005, Faillace left an unsigned copy in Whelan's mailbox. To expedite compliance with the State's Attorneys Office's request for the letter, Whelan quickly read it and then signed "Ondrea Faillace/ADW" to indicate that while Faillace had drafted the letter Whelan was signing her name. Whelan then contacted Bella

4

because he was unsure where the letter should be sent.  Bella faxed the letter to Assistant State's Attorney Hall at the State's Attorneys Office.

"On June 2, 2006, the [plaintiff] was arrested and charged with having a weapon in a motor vehicle and possession of drug paraphernalia." Palkimas, 116 Conn. App. at 792.  At a July 11, 2006 hearing, the State orally moved to revoke the plaintiff's participation in the Family Violence Education Program based on the November 2005 and June 2006 arrests.  On July 26, 2006, Judge Tobin granted the State's written motion to revoke the plaintiff's participation in the program.  At the July 26, 2006 hearing, the court admitted as an exhibit the eight-page DCF letter written by Faillace. The plaintiff's counsel argued that DCF employees had improperly disclosed to the prosecutor information contained in the letter in violation of Connecticut state law, and therefore the letter should not have been submitted to the court.  The court decided to proceed over the plaintiff's objection.

The plaintiff again raised the issue of the DCF letter at a hearing held on October 19, 2006 to discuss the plaintiff's motion to reargue the revocation of his participation in the Family Violence Education Program.  The plaintiff argued that Judge Grogins, i.e. a different judge than the one who had made the decision to revoke the plaintiff's participation in the

Family Violence Education Program, should recuse himself because
he had read the letter.  The judge indicated that he did not
remember reading the letter and continued the hearing until he
could get a transcript.  At the continued hearing on October 25,
2006, the plaintiff again stated that the judge had been exposed
to a DCF report that should not have been available and the judge
should therefore recuse himself.  Ultimately the motion to recuse
was denied.

Several weeks later, the plaintiff filed a new motion to
recuse.  The matter was continued until December 12, 2006.  At
the December 12, 2006 hearing, the motion to recuse was denied.
The plaintiff filed another motion to reconsider the rulings on
the motion to recuse.

On July 10, 2007 the plaintiff pled "nolo contendere" to a
charge of felony violation of a protective order.  In exchange
for his plea, the remaining charges were nolled.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such issue
warrant judgment for the moving party as a matter of law.  Fed.
R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317,
322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d
1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of

6

summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." Anderson, 477 U.S. at 248
(internal quotation marks omitted).  A material fact is one that
would "affect the outcome of the suit under the governing law."
Id.  As the Court observed in Anderson: "[T]he materiality
determination rests on the substantive law, [and] it is the
substantive law's identification of which facts are critical and
which facts are irrelevant that governs." Id.  Thus, only those
facts that must be decided in order to resolve a claim or defense
will prevent summary judgment from being granted.  When
confronted with an asserted factual dispute, the court must
examine the elements of the claims and defenses at issue on the
motion to determine whether a resolution of that dispute could
affect the disposition of any of those claims or defenses.
Immaterial or minor facts will not prevent summary judgment.  See
Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

    When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d
33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v.
Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because
credibility is not an issue on summary judgment, the nonmovant's
evidence must be accepted as true for purposes of the motion.
Nonetheless, the inferences drawn in favor of the nonmovant must

be supported by the evidence.  "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." <u>Stern v. Trustees of Columbia Univ.</u>, 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." <u>Anderson</u>, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  <u>See Celotex Corp.</u>, 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," <u>Weinstock</u>, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." <u>Aslanidis v. United States Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." <u>Weinstock</u>, 224 F.3d at 41.  If the

9

nonmovant fails to meet this burden, summary judgment should be granted.

## III.  DISCUSSION

A.  Qualified Immunity

Defendants Whelan and Bella contend that they are entitled to qualified immunity.

> Our analysis of a qualified immunity claim consists of a three step inquiry.  First, we must determine whether plaintiff has alleged a violation of a constitutional right.  Then we consider if the violated right was clearly established at the time of the conduct.  Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [public employees], he or she must demonstrate that defendants' actions were not objectively reasonable.  This three step inquiry should typically be done in sequential order.

Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 203, 211 (2d Cir. 2003).  "This approach, however, is not mandatory." Rapkin v. Rocque, 228 F. Supp. 2d 142, 146 (D. Conn. 2002) (citing African Trade & Info. Ctr. v. Abromaitis, 294 F.3d 355, 359 (2d Cir. 2002)).  "[A] court can often avoid ruling on the plaintiff's claim that a particular right exists," if that right has not been clearly established and therefore qualified immunity is applicable.  Camreta v. Green, 131 S. Ct. 2020, 2031 (2011). Because the court concludes that the plaintiff did not have a clearly established privacy right that was violated by submission of the DCF letter to the State's Attorneys Office, it declines to address either whether there was a violation of a constitutional

right or whether it was objectively reasonable for defendants
Bella and Whalen to believe their actions were consistent with
the plaintiff's constitutional rights.

The plaintiff argues that "[t]he right to be free from the
disclosure of intimate personal information" has been clearly
established under the Fourteenth Amendment. (Pl. Mem. in Opp. 18,
Doc. No. 32)  "For a constitutional right to be clearly
established, its contours 'must be sufficiently clear that a
reasonable official would understand that what he is doing
violates that right.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002).
To determine whether a right is clearly established, the court
considers:

> (1) whether the right in question was defined with
> 'reasonable specificity';
> (2) whether the decisional law of the Supreme Court and
> the applicable circuit court support the existence of
> the right in question; and
> (3) whether under preexisting law a reasonable
> defendant official would have understood that his or
> her acts were unlawful.

Dean v. Blumenthal, 577 F.3d 60, 68 (2d Cir. 2009) (quoting
Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991)).  "If prior
case law has not clearly settled the right, and so given
officials fair notice of it, the court can simply dismiss the
claim . . . ." Camreta, 131 S. Ct. at 2031.

"As a general matter, 'there exists in the United States
Constitution a right to privacy protecting the individual
interest in avoiding disclosure of personal matters.' 'More

11

precisely, this right to privacy can be characterized as a right
to confidentiality.'" Matson v. Bd. of Educ. of City School Dist.
of New York, 631 F.3d 57, 63-64 (2d Cir. 2011).

In Matson, the Second Circuit addressed whether there was a
right to confidentiality that protects against disclosure of the
fact that one suffers from fibromyalgia.  The court held first,
that there is a right to confidentiality protecting against
disclosure of certain medical information.  However, then the
court went on to consider the facts and circumstances specific to
the confidentiality interest asserted in that case.  "A general
medical determination or acknowledgment that a disease is serious
does not give rise ipso facto to a constitutionally-protected
privacy right." Id. at 65.  "In considering claims that a
constitutional right of privacy attaches to various serious
medical conditions, we also proceed on a case-by-case basis.  In
doing so, we examine all the relevant factors that cut both in
favor of and against extending privacy protection to such medical
conditions." Id. at 66-67.

The plaintiff asserts a right to "be free from the
disclosure of intimate personal information under . . . the
Fourteenth Amendment." (Pl. Mem. in Opp. 18).  The information
contained in the DCF letter was information obtained during an
ongoing investigation by DCF to ensure the safety of the
plaintiff's children and to investigate whether the plaintiff had

a penchant for violence towards his girlfriend.  During the time the investigation was ongoing, the family was under protective supervision by DCF and the plaintiff was participating in the Family Violence Education Program, a program for which he had applied.  Representatives of the Family Violence Education Program and the State's Attorneys Office were part of the group with which Bella regularly met and to which she made recommendations with the safety of children in mind and reported on the status of, <u>inter</u> <u>alia</u>, DCF investigations.  The DCF letter was disclosed by Bella and Whalen to Assistant State's Attorney Goldstein for use in a domestic violence case against the plaintiff in Connecticut Superior Court.  The letter contains details regarding the interactions between the plaintiff, his family, and DCF, and also makes a recommendation regarding an appropriate sentence that would protect the plaintiff's children, the plaintiff's girlfriend, and the public.

In support of his assertion of a right to privacy, or more precisely, a right to confidentiality, the plaintiff cites <u>Ferguson v. City of Charleston</u>, 532 U.S. 67 (2001) (disclosure of blood or urine tests); <u>Whalen v. Roe</u>, 429 U.S. 589 (1977) (disclosure of name on a list of medical drug users); <u>Paul v. Davis</u>, 424 U.S. 693 (1976) (plaintiff listed on "Active Shoplifters" flyer); <u>O'Connor v. Pierson</u>, 426 F.3d 187 (2d Cir. 2005) (release of past medical records); <u>Hunnicutt v. Armstrong</u>,

152 Fed. Appx. 34 (2d Cir. 2005) (disclosure of mental health issues); Powell v. Schriver, 175 F.3d 107 (2d Cir. 1999) (disclosure of prisoner as transsexual); Doe v. City of New York, 15 F.3d 264 (2d Cir. 1994) (disclosure of HIV status); and Barry v. City of New York, 712 F.2d 1554 (2d Cir. 1983) (inspection of annual financial reports).  These cases support the proposition that an individual enjoys Constitutional protection from disclosure of certain intimate personal information.  However, none of the cases cited from the Supreme Court or the Second Circuit defines that right with reasonable specificity for purposes of applicability to the facts and circumstances of this case.  None of these cases states the contours of such a right in terms that are sufficiently clear such that Bella and Whalen would have understood that disclosure of the information in the DCF letter to the State's Attorneys Office would violate the plaintiff's constitutional rights.

Because the plaintiff has failed to show that he had a clearly established privacy right with respect to the information disclosed by defendants Bella and Whalen to the State's Attorneys Office, those defendants are entitled to qualified immunity. Therefore, the motion for summary judgment is being granted as to the plaintiff's § 1983 claim.

**B.  Connecticut Common Law**

The plaintiff claims that his privacy rights under

14

Connecticut common law were violated.  He contends that "[u]nder Connecticut law, the common law right to privacy can be violated in four distinct ways: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of the other's name or likeness; (3) unreasonable publicity given to the other's private life; (4) 'widespread' publicity that unreasonably places the other in a false light before the public."  (Pl.'s Mem. in Opp'n 9).  He does not state which of the four categories he is relying on.  As to (2) and (4), however, there is no assertion by the plaintiff that anyone appropriated the plaintiff's name or that he was painted in a false light by the DCF letter.

As to (1):

> [t]he invasion of privacy by unreasonable intrusion upon the seclusion of another has been defined as "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy if the intrusion would be highly offensive to a reasonable [person]."

Schmidt v. Devino, 206 F. Supp. 2d 301, 309-10 (D. Conn. 2001) (quoting In re State Police Litig., 888 F. Supp. 1235, 1270 (D. Conn. 1995)) (alterations in original).  Here the plaintiff is not claiming that the defendants intruded upon his privacy by intrusion upon his seclusion; rather his claim relates to the transmission of the information in the DCF letter.  To the extent there had been any intrusion upon his seclusion that occurred in the context of the DCF investigation, given the circumstances

15

surrounding the defendant's nolo contendre plea, <u>see</u> <u>State v.</u>
<u>Palkimas</u>, 116 Conn. App. 788 (2009), it cannot be disputed that
DCF's conducting an investigation was a reasonable intrusion.
Therefore, the plaintiff has not produced evidence that could
support a claim for unreasonable intrusion upon the seclusion of
another.

Finally, as to (3), the tort of "unreasonable publicity
given to the other's private life" "requires 'publicity,' which
means 'a communication that reaches, or is sure to reach, the
public at large.' It is 'not an invasion of privacy to
communicate a fact concerning the plaintiff's private life to a
single person or even to a small group of persons.'" <u>In re</u>
<u>Cordier</u>, Bankruptcy No. 08-20298 (ASD), 2009 WL 890604, at *6
(Bankr. D. Conn. March 27, 2009) (quoting <u>Sidiropoulos v.</u>
<u>Bridgeport Hospital</u>, No. CV030401830S, 2004 WL 202256, at *2
(Conn. Super. Jan. 9, 2004)).  The plaintiff's claim is based on
the fact that Bella and Whalen provided the DCF letter to the
State's Attorneys Office, which caused it to be provided to the
Superior Court.  This was a small group of persons. The plaintiff
has failed to create a genuine issue of material fact as to
whether the DCF letter was a communication that reached or was
about to reach the public at large, and also failed to create a
genuine issue of material fact as to whether any publicity that
occurred here was unreasonable given the purpose for which the

DCF letter was submitted to the State's Attorneys Office.

Thus, the plaintiff has failed to create a genuine issue of material fact as to whether Bella and/or Whalen violated his right of privacy with respect to any of the four categories of invasion of privacy under Connecticut common law.  Therefore, Bella and Whalen are entitled to judgment as matter of law on this claim.

**III. CONCLUSION**

For the reasons set forth above, the Motion for Summary Judgment (Doc. No. 30) is hereby GRANTED, and the Clerk shall enter judgment in favor of defendants Bella and Whalen with respect to all claims against them.

The Clerk shall close this case.

It is so ordered.

Dated this 28th day of March at Hartford, Connecticut.


_____
               /s/AWT
        Alvin W. Thompson
   United States District Judge